**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | M.J. No. 26-1219-DLC |
| v. | |
| MARK HENRY CHEN, | **FILED UNDER SEAL** |
| Defendant. | |

**AFFIDAVIT OF MICHAEL D. LITTLE III IN SUPPORT OF AN**
**APPLICATION FOR A CRIMINAL COMPLAINT**

I, Michael D. Little III, being duly sworn, hereby depose and state the following:

**INTRODUCTION**

1. I am a special agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019. I am assigned to the Merrimack Valley Transnational Organized Crime Task Force ("MV TOC Task Force") of the FBI's Boston Division, where I conduct complex criminal enterprise investigations against violent criminals involved in myriad criminal activities, including the illegal distribution of narcotics, firearms trafficking, and associated violent crimes. Prior to joining FBI, I spent five years as a police officer with the Metropolitan Police Department of Washington, D.C., where I worked as a patrol officer, undercover officer, and vice detective. I conducted numerous drug investigations targeting violent criminals and received training on how to conduct drug investigations.

2. As it relates to drug trafficking, in the course of participating in investigations, I have conducted or participated in surveillance; the controlled purchase of illegal drugs; the execution of search warrants; debriefings of subjects, witnesses, and informants; wiretaps; and reviews of consensually recorded conversations and meetings. I have also received training

through my position as an FBI special agent involving narcotics trafficking.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, including their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

**PURPOSE OF AFFIDAVIT**

6.      I submit this affidavit in support of a criminal complaint against Mark Henry CHEN for one count of distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (the "CHARGED OFFENSE") on or about February 3, 2026.  As further described below, there is probable cause to believe that CHEN has committed the CHARGED OFFENSE.

7.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause to issue the requested criminal complaint and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

8.      This investigation demonstrated that CHEN is a drug trafficker who sells crystal methamphetamine in Woburn, Massachusetts, and surrounding areas.  On four occasions since January 2026, CHEN has – in monitored, recorded, and surveilled transactions – sold methamphetamine to a witness cooperating with the FBI ("CW-1"[1]) (collectively, the "TARGET OFFENSES").

---

[1] CW-1 is cooperating for monetary compensation.  CW-1 has a criminal history that includes convictions for theft.  Based on the corroboration of CW-1's information, I believe that CW-1 is credible and reliable.

### General Pattern of Controlled Purchases

9.      Investigators directed CW-1 to purchase methamphetamine from CHEN on four occasions: January 2, 2026; January 12, 2026; January 22, 2026; and February 3, 2026.  On these four occasions, in total, CHEN sold about 210 grams of methamphetamine to CW-1 for a total of $3,950.

10.      CHEN used a mobile phone associated with phone number (781) 368-3437 (the "3437 phone") to arrange these transactions.  Prior to the start of the investigation, CW-1 provided investigators with 3437 phone's phone number and said contacting CHEN at that number was a way to arrange narcotics purchases.  Further investigation showed that Verizon provides the 3437 phone's cellular service via an account registered to CHEN.

11.      CW-1 was familiar with CHEN and knew from their prior narcotics transactions that CHEN would require CW-1 to travel to CHEN's residence.  Through confidential source reporting and surveillance conducted by local law enforcement partners, investigators knew during the investigation period that CHEN was residing at the Homewood Suites by Hilton ("the Homewood Suites hotel").  This hotel is located at 371 Washington Street in Woburn, Massachusetts.  Agents believe that CHEN was residing in Room 216 of this hotel.

12.      In addition, source reporting indicated that CHEN was employed during the time of the investigation by Wayne's Drains, Inc., and drove a large, white, pick-up truck.  On the evening of December 31, 2025, local law enforcement conducted surveillance and saw a white Ford pickup (the "Ford pickup") with a Wayne's Drains decal parked in the rear parking lot of the Homewood Suites hotel.  As described below, investigators have seen CHEN using the Ford pickup immediately before and after various controlled purchases.

13.     These controlled purchases followed a pattern.    Specifically, prior to each controlled purchase and at my direction, CW-1 communicated with CHEN on the 3437 phone – principally by text message – to arrange the purchase of methamphetamine.    When those text messages occurred outside my presence, CW-1 captured images of the text messages and provided them to me.  I reviewed and preserved these messages in the case file.  When CW-1 communicated with CHEN in the presence of investigators, investigators reviewed CW-1's call log and text messages to confirm the communications.  Investigators also preserved those messages.

14.     On the day of each transaction, investigators met CW-1 at a predetermined location. There, they searched CW-1's person and vehicle for contraband, which the investigators never found.  They also searched CW-1's person and vehicle for U.S. currency.  On January 2, 2026, and February 3, 2026, investigators found $33 and $3, respectively.    On those occasions, investigators retrieved CW-1's personal money, counted it in CW-1's presence, and held it in a secure location until after CW-1 had returned and been searched following the controlled purchase. On the other two occasions, investigators did not find U.S. currency on CW-1 or in his/her vehicle.

15.     Next, investigators equipped CW-1 with audio recording, video recording, and surveillance devices.  They also provided CW-1 with official agency funds ("OAF"), which the CW-1 used to purchase methamphetamine from CHEN.

16.     Then, while investigators maintained physical and electronic surveillance of CW-1, s/he drove his/her vehicle to the location, usually suggested by CHEN, for the transaction.  With the exception of the buy conducted on January 2, 2026, these transactions occurred in the parking lot of the Homewood Suites hotel.  After CW-1 arrived there, CHEN got into CW-1's vehicle. Often, he carried a plastic bag and engaged in a short conversation with CW-1.  However, soon, CHEN left the methamphetamine in CW-1's vehicle, took the OAF, and got out of CW-1's vehicle.

4

CHEN then returned either to the Ford pickup or walked into the lobby of the Homewood Suites hotel.

17.    Following each transaction, investigators surveilled CW-1 as s/he drove from the buy location and to a predetermined meeting location.  There, CW-1 returned the audio, video, and surveillance equipment to the investigators.  Agents preserved those recordings and later reviewed them.  Typically, the video and audio qualities were clear, and investigators could clearly see and recognize that CHEN was the person selling methamphetamine to CW-1.  Investigators confirmed CHEN's identity by comparing video recording images to CHEN's driver's license photograph, obtained through a National Crime Information Center check.  They also compared the video images to CHEN's booking photo, obtained after a September 2025 arrest and maintained in the Massachusetts Automated Fingerprint Identification System database.

18.    Following the transactions, agents also searched CW-1 for contraband and for U.S. currency.  These searches produced no unexpected results.  Investigators then used the TruNarc system to test the crystal-like substances that CHEN had provided CW-1.[2]  These substances always tested positive for the presumptive presence of methamphetamine.  On each occasion, the weight of the substances was also consistent with the amount of methamphetamine that CHEN had agreed to sell.  Investigators then sent these materials to the DEA Northeast Regional Laboratory, which confirmed that they contained methamphetamine.

19.    Below, I provide additional details specific to each of the controlled transactions.

**Chen Sold 14 Grams of Methamphetamine on January 2, 2026**

---

[2] TruNarc is a portable device that uses spectrometry and gas chromatography to analyze unknown substances.  The device is commercially available and allows for the rapid and non-destructive identification of narcotics, narcotics precursors, essential chemicals, and cutting agents.  In my experience, TruNarc results are highly accurate when analyzing substances consisting of methamphetamine or fentanyl.

5

20.     On the afternoon of January 2, 2026, CW-1 met investigators at a predetermined location.  They spoke with CW-1 about the contacts s/he had conducted, as directed, with CHEN. Investigators also physically reviewed the contact history in CW-1's phone and confirmed that the number for the 3437 phone was saved under the name "Chung," a nickname that CW-1 sometimes used for CHEN.  Investigators reviewed the text messages CW-1 had sent to CHEN on the 3437 phone.  In one of these messages, CHEN asked CW-1 if s/he wanted to purchase seven grams or 14 grams.  CW-1 responded that s/he wanted 14 grams.  CHEN agreed to sell this quantity and said the price would be $400.  Then, while CW-1 was in the presence of investigators, CHEN wrote to CW-1 and asked if they were still meeting.  CHEN also asked CW-1 for his/her estimated time of arrival because CHEN had been called into work.  CHEN instructed CW-1 to go to the Homewood Suites hotel.

21.     Prior to this controlled purchase, I provided CW-1 with $400 in OAF.  At about 4:06 p.m., while CW-1 was en route to the Homewood Suites hotel, CHEN sent him/her a text message telling him/her to meet CHEN in Burlington, Massachusetts instead.  Given that, CW-1 suggested meeting near Shaw's, a Burlington grocery store about five miles from the Homewood Suites hotel.  CW-1 arrived at Shaw's, and as captured in the photograph below, investigators saw CHEN arrive shortly thereafter in the Ford pickup, which he was driving.

6



22.     Upon arriving, CHEN parked the Ford pickup in the grocery store parking lot and entered CW-1's vehicle.  Moments later, CHEN got out of CW-1's vehicle and reentered the Ford pickup.  Both CHEN and CW-1 drove away from the buy location.

23.     The video and audio quality of the recordings of this controlled purchase are clear. Reviewing them at a later time, I could clearly see that CHEN was the person who interacted with CW-1.  Below, I have included some still recording images showing CHEN conducting the drug transaction inside CW-1's vehicle.



24.     Returning to the predetermined meeting location, CW-1 provided investigators with a clear plastic bag containing two additional clear plastic bags, which in turn held a crystal-like substance.  The DEA Northeast Regional Laboratory later confirmed that the total contents of the bags weighed about 14.0 grams, consistent with the quantity of methamphetamine that CW-1 ordered.  The contents were 97% pure methamphetamine.

### Chen Sold 28 Grams of Methamphetamine on January 12, 2026

25.     Prior to January 12, 2026, investigators instructed CW-1 to contact CHEN and arrange for a controlled, in-person, narcotics purchase.  Investigators later reviewed the text and call logs on CW-1's phone and preserved images of these.  They showed that, as requested, CW-1 had contacted CHEN on the 3437 phone.   They also showed that CHEN had agreed to sell CW-1 an ounce of methamphetamine for $650 and instructed CW-1 to meet him at the Homewood Suites hotel.

26.     At about 4:51 p.m. on January 12, 2026, members of the investigative team established physical surveillance at the Homewood Suites hotel.  Upon their arrival and as shown in the photos below, investigators saw the Ford pickup parked in the Homewood Suites hotel parking lot.



27.     At about 5:08 p.m., CW-1 arrived at the Homewood Suites hotel and parked next to the Ford pickup.  Moments later, investigators saw CHEN leaving the hotel's rear lobby door and approaching CW-1's vehicle.  Later reviewing CW-1's video recording of the transaction, investigators saw CHEN holding a small plastic bag in his left hand as he got into CW-1's vehicle. CHEN immediately handed the bag to CW-1.  CHEN subsequently retrieved the OAF from the center console.  While CHEN was inside of CW-1's vehicle, they engaged in a brief conversation. Investigators could hear CHEN tell CW-1 that he would drop the price of an ounce of crystal methamphetamine to $600.  Still images from the recording are reproduced below.  They show CHEN selling the methamphetamine inside CW-1's vehicle.





28.    Following the deal, CHEN got out of CW-1's vehicle and went back into the rear lobby of the Homewood Suites hotel.  CW-1 drove away from the buy location and met investigators at their predetermined location.  Investigators later transported the contents of CHEN's plastic bag to the DEA Northeast Regional Laboratory, which confirmed that the contents weighed about 28.0 grams, almost exactly one ounce.  The laboratory also found that the contents were about 86% pure methamphetamine.

### Chen Sold 56 Grams of Methamphetamine on January 22, 2026

29.    Prior to January 22, 2026, investigators instructed CW-1 to initiate contact with CHEN to arrange another controlled narcotics purchase.  Reviewing CW-1's phone, investigators confirmed that CW-1 had sent the requested text messages, which they preserved and memorialized, to the 3437 phone.  The messages showed that CHEN had agreed to sell CW-1 four ounces of crystal meth for $1,950.  In addition, CHEN instructed CW-1 to meet him at the Homewood Suites hotel.

30. On January 22, 2026, at about 3:32 p.m., CHEN used the 3437 phone to send CW-1 a text message stating that he only had two ounces of crystal methamphetamine. Because of this change in plans, CHEN agreed to lower the price of the controlled substance to $500 per ounce. I directed CW-1 to call CHEN. CW-1 did not record the call, but it occurred on speaker phone and in the presence of the investigative team.

31. CHEN answered the phone and said that his primary source of supply had unexpectedly traveled to the Dominican Republic. CHEN said that he only had two ounces of crystal methamphetamine left from that supplier and, therefore, that he had obtained additional supply from an alternate source. CHEN said that the methamphetamine he had obtained from the alternate supplier was of poor quality. CHEN advised that he preferred to provide CW-1 with the high-quality methamphetamine he had from his primary supplier. At my direction, CW-1 agreed to meet CHEN and to purchase the two remaining ounces of crystal methamphetamine. CHEN instructed CW-1 to meet him at the Homewood Suites hotel. Investigators provided CW-1 with $1,000 in OAF.

32. At about 4:44 p.m., CW-1 parked in the Homewood Suites hotel parking lot. Moments later, investigators saw CHEN come out of the Homewood Suites hotel rear lobby door and approach CW-1's vehicle. Later reviewing the video and audio, which were clear, investigators could see CHEN enter CW-1's vehicle with what appeared to be a small plastic bag in his right hand. CHEN immediately handed the bag to CW-1 and retrieved the OAF from the center console. Still images from the recording, reproduced below, show CHEN conducting a drug transaction inside CW-1's vehicle.





33.    CHEN and CW-1 engaged in a brief conversation.  Investigators heard CHEN say that he buys a pound of crystal methamphetamine every time he renews his methamphetamine supply.  CHEN also said that he has several crystal methamphetamine suppliers.  In addition, CHEN said he was willing to sell CW-1 a quarter pound (about four ounces) of crystal methamphetamine at another time.

34.    After the transaction, CW-1 traveled to the predetermined meeting location and provided investigators with two clear plastic bags containing a crystal-like substance.  DEA's Northeast Regional Laboratory later tested the contents of the bags.  The laboratory determined that they weighed about 56.3 grams, consistent with the quantity of crystal methamphetamine that CHEN agreed to sell.  The laboratory also reported that the contents contained methamphetamine and were about 62 percent pure.

**THE CHARGED OFFENSE:**
**Chen Sold 112 Grams of Methamphetamine on February 3, 2026**

35.     Prior to February 3, 2026, investigators instructed CW-1 to initiate contact with CHEN on the 3437 phone and see whether he would be willing to engage in another narcotics transaction.  Investigators reviewed these text messages in CW-1's phone and preserved images of them.  CHEN agreed to sell CW-1 about a quarter pound (about 4 ounces) of crystal methamphetamine for $1,950 and instructed CW-1 to meet him at the Homewood Suites hotel.  I provided CW-1 with $1,950 in OAF.

36.     At about 3:56 p.m., investigators saw CHEN arrive at the Homewood Suites in the Ford pickup.  CHEN was the vehicle's sole occupant.  CHEN parked, got out of the Ford pickup, and went inside the Homewood Suites hotel.  Investigators surveilled him as CHEN went to the lobby restroom, then left the building, and got back in the Ford pickup.

37.     At about 4:19 p.m., CW-1 arrived and parked in the Homewood Suites hotel parking lot.  CW-1 called the 3437 phone.  CHEN answered and informed CW-1 that he would enter CW-1's vehicle.  Shortly after, CHEN got out of the Ford pickup and got into CW-1's vehicle.  The video shows that, while inside of CW-1's vehicle, CHEN retrieved a clear plastic bag from his left pants pocket and placed it on the center console.  CHEN then retrieved the OAF from the cup holder.  Still images from the recording are reproduced below and show CHEN conducting the drug transaction inside of CW-1's vehicle.

13







38.    Following the deal, members of the surveillance team watched CHEN get out of CW-1's vehicle.  He then went back into the Ford pickup, got out of that truck, and walked into the Homewood Suites hotel lobby, where he retrieved packages and then went into an elevator. Additional members of the surveillance team were positioned on the second floor of the Homewood Suites hotel.  They saw CHEN get out of the elevator and then, at about 4:36 p.m., use a keycard to enter room number 216.

39.    Upon arriving at the predetermined meeting location after the deal, CW-1 provided investigators with a clear Ziplock bag that contained four additional plastic bags containing a crystal-like substance.  The DEA Northeast Regional Laboratory later tested the contents of the bags and determined that they contained methamphetamine and weighed about 112.3 grams, consistent with the quantity of crystal methamphetamine ordered by CW-1.  The laboratory further reported that the contents were also 94% pure methamphetamine.

### Agents Recovered Methamphetamine from Room 216

40.    On March 17, 2026, the Honorable M. Page Kelley issued a warrant to search Room 216 for evidence relating to the TARGET OFFENSES.  *See* Case No. 26-mj-6274-MPK.  Agents executed the warrant on the morning of March 19, 2026.  Prior to doing so, they saw CHEN leave the Homewood Suites hotel and walk toward the Ford pickup.  Agents approached and detained him.  Executing the warrant on Room 216 shortly afterward, they found about 54.95 grams of a substance that a TruNarc field test indicated contained methamphetamine.  CHEN had a room key and admitted that he had been staying in Room 216.  Agents also seized his cellular telephone.

//

//

//

//

## CONCLUSION

41.    Based on training and experience, consultation with other special agents and law enforcement officers, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that CHEN has committed the CHARGED OFFENSE.

_Michael Little_ DLC

Michael D. Little III
Special Agent, FBI

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by ~by telephone~

_____
Honorable DONALD L. CABELL
United States Magistrate Judge

on April ___10___, 2026.

16